**UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION**

ANDRAE J. JOHNSON,

       Plaintiff,

v.                                                 Case No. 3:15-cv-324-J-32JBT

C/O GLASS, et al.,

       Defendants.
_____

## **ORDER**

### **I. Status**

Plaintiff, an inmate of the Florida penal system, initiated this case by filing a pro se Civil Rights Complaint (Doc. 1) pursuant to 42 U.S.C. § 1983. He names three correctional officers (Glass, Roach, and Joseph) as Defendants and alleges that Defendants used excessive force on him.

Before the Court is Defendants' Motion for Summary Judgment (Doc. 25) (Motion), including exhibits.[1] Defendants argue: (1) they are entitled to Eleventh Amendment immunity for claims against them in their official capacities for monetary damages; (2) Plaintiff cannot show that Defendants violated the Eighth Amendment; (3) Defendants are entitled to qualified immunity; and (4) Plaintiff is barred from seeking emotional, compensatory, or punitive damages by 42 U.S.C. § 1997e(e). The Court previously advised Plaintiff of the provisions of Federal Rule of Civil Procedure 56, notified him that the granting of a motion

---

[1] The exhibits attached to the Motion are cited as "Ex." Citations to the exhibits are to the page numbers assigned by the Court's electronic case filing system.

for summary judgment may foreclose subsequent litigation on the matter, and gave him an opportunity to file a response. See Order (Doc. 7); see also Orders (Docs. 22, 29, 34). Plaintiff has responded. See Responses (Docs. 32, 35).

## **II. Parties' Positions**

In the Complaint,[2] Plaintiff alleges that on February 6, 2014, at approximately 9:00 a.m., while housed at Columbia Correctional Institution Annex, he told Defendant Glass that he was in fear for his life and he requested protection. Defendant Glass told Plaintiff, "no," and he "called for backup." Defendants Joseph and Roach responded, and they "began a brutal assault" on Plaintiff. Defendant Roach punched Plaintiff in his head and face, and Defendant Joseph kneed Plaintiff in the back. Defendant Glass kicked Plaintiff in the testicles. Plaintiff had "a busted eye, fractured nose, and swollen testicles." Defendants then laughed at Plaintiff and sang, "we never walk alone." Plaintiff was denied medical attention by a nurse. As relief, he requests monetary damages for his "pain [and] suffering."

At Plaintiff's deposition, he provided additional information:

    Q.    Okay. What happened first? . . .

    A.    Officer Roach and Officer Joseph began punching me.

    Q.    While you were standing?

    A.    In my face. I was sitting.

    Q.    You were sitting. So they were standing over you? How was this?

---

[2] The Court credits the "specific facts" pled in Plaintiff's sworn Complaint when considering the summary judgment Motion. Caldwell v. Warden, FCI Talladega, 748 F.3d 1090, 1098 (11th Cir. 2014) (citations omitted).

2

A. Standing over me and they grabbed me up, both of them grabbed me up and began assaulting me, punching me and not yet kicking me, until they throwed me on the ground.

Q. So who threw you on the ground?

A. Both officer, Sergeant Joseph and Officer Roach.

Q. Now, where was Glass, at this point in time?

A. Coming from around the desk joining the assault.

Q. And what happened next?

A. Well, they got me on the ground and began stomping my testicles. Officer Joseph was stomping - - stomping me as I was trying to get up on my knees and Officer Glass began punching me, as well, with his handcuffs. . . . After that I was bleeding, laying there on the floor and they cuffed me up, shackled me up and carried me out to confinement. . . . [T]hey had my body sideways and was toting me because I couldn't - - after the assault I couldn't walk. And my testicles was actually black and blue and swollen where I could not move from injuries sustained.

Q. And what happened next? . . .

A. Well, they carried me to this office that's - - has a holding cell, which is the lieutenant's office a couple of doors down from the confinement unit.

. . . .

Q. So they took you to this holding cell. What happened next?

A. Interrogating me, saying that they're going to give me outside charges and steady taunting me and kept me in there for like an hour.

. . . .

3

Q. Okay. So after you were in this holding cell for over an hour, what happened next?

A. They took me to confinement.

. . . .

Q. Did you get evaluated by medical before you went to confinement?

A. No, sir.

. . . .

Q. So did you see nurse Norris that day at all?

A. Yes, I did.

Q. When?

A. On the way to confinement.

. . . .

Q. So what did she do? . . .

A. Well, she took their side and said I wasn't assaulted and this and that and denied seeing me. And I supposed to have been seen for injuries, evaluated.

. . . .

Q. Did they take your vitals all that, did they weigh you, did they do anything?

A. No, sir. None of that.

. . . .

Q. And did you say anything to Norris?

A. Told them about my injuries and that I was assaulted.

Q. And she just did nothing?

4

A. No, sir.

. . . .

Q. . . . Did they tell you why you were being taken to confinement?

A. Yes. They - - Officer Glass wrote me the DR.

Q. So they said you're going to confinement for a DR?

A. (Witness nods head). That's why I was originally placed in confinement and they never did anything about my protection.

. . . .

Q. Okay. Now, what injuries did you incur as a result of this assault?

A. A busted eye, a busted lip and black and blue, my testicle was swollen the size of grapefruits, real big.

. . . .

Q. How long did the swelling in your testicles last?

A. Probably two weeks.

Q. And your fractured nose, was it crooked, was it bleeding, describe the nose?

A. There was blood coming out of it, gushing onto my shirt and it was crooked.

Q. So how - - now, I'm looking at your nose now, it's not crooked. Is that accurate to say that?

A. Yes. Yes, sir.

Q. . . . If it was broken and crooked, how did it become straight like it is now?

5

> A. I don't know because nothing - - never had no treatment for it or nothing.
>
> . . . .
>
> Q. Okay. Now, you said busted eye. Describe your busted eye.
>
> A. It was a cut on top of my eye. . . . Above my eyebrow and it was - - you can see the pink meat.

Ex. A at 16-35. Plaintiff indicated that the cut above his eyebrow was about two inches long and about one-quarter inch wide. Id. at 36. He also stated that he still has a scar above his eye, but at the deposition, he could not remember if it was above his left or right eye.[3] Id.

Each Defendant submitted a declaration averring that Plaintiff's allegations "are absolutely untrue." Exs. D, H, I. They also assert that they never "struck or attacked" Plaintiff, "jeopardize[d] his safety," or witnessed another "officer commit any unlawful action." Defendant Glass explained his interaction with Plaintiff on the date of the alleged assault:

> On February 6, 2014, at approximately 9:00 am, I received an inmate request from Ms. R. McDonald, Senior Classification Officer, requesting me to investigate the request where the following threat was written: "Im going to rape and kill you when I catch you on the compound I hate you white b****." The inmate name written on the request as the person who submitted it is "Ronald Arrowood."[4] I interviewed Arrowood (FDC #Q08611) who denied writing the request. I then interviewed Arrowood's cell mate, inmate Andrae Johnson (FDC #T06510), who stated that he wrote the request because he wanted protection and was in fear for his life.

---

[3] In his Response (Doc. 32), Plaintiff stated that he has a three-to-five inch scar above his left eye as a result of the alleged assault. The undersigned reviewed the videotape of Plaintiff's deposition (Ex. P, filed under seal), during which the attorney zoomed in on Plaintiff's face. There is no readily apparent scar in the length described by Plaintiff.

[4] The inmate request is attached to Defendant Glass's declaration. See Ex. D at 7.

> During my interview with Johnson, he claimed that he was receiving cell phones and spice through an Officer Hewitt to sell on behalf of the officer to inmates, that he owes this officer $1200 that he cannot pay, on February 4, 2014, and that five unknown inmates entered Johnson's cell and threatened Johnson with bodily harm unless he pays Officer Hewitt. I investigated Johnson's claims, including interviewing Officer Hewitt, Arrowood, and another inmate housed in a nearby cell, but found no evidence to substantiate Johnson's claims. I submitted the evidence that I gathered to the [Institutional Classification Team (ICT)].
>
> Still, Johnson was assigned to administrative confinement by Captain S. Swain on February 6, 2014, and approved by the ICT on February 7, 2014, pending protective review.
>
> Because he wrote and admitted to writing a threat against Ms. McDonald, I wrote a disciplinary report . . . against Johnson for spoken, written, or gestured threats . . . . The disciplinary hearing team found Johnson guilty for the [disciplinary report] based on his guilty plea,[5] and sanctioned him with loss of gain time and disciplinary confinement.
>
> My involvement with Johnson consist[ed] of only investigating the threatening inmate request written by Johnson, writing a [disciplinary report] against Johnson for the written threat that he ple[]d guilty to, and investigating Johnson's claim of needing protection.

Ex. D at 2 (paragraph numbers and citations omitted).

Defendants Roach and Joseph were both assigned to different areas of the institution during the time in which Plaintiff says they attacked him. Defendant Joseph averred that "[f]rom about 8:55 am to 10:55 am, I was assigned as a secondary duty to a recreation yard where I was responsible for supervising inmates on this recreation yard." Ex. I at 1. Defendant Joseph was shown a photograph of Plaintiff, and while he recognized him, he

---

[5] At deposition, Plaintiff insisted that he pled not guilty. Ex. A at 31-32.

could "not recall anything else about" him. Id. Defendant Roach stated that "[f]rom about 8:55 am to 10:37 am, I was assigned as a secondary duty to a recreation yard where I was responsible for supervising inmates on this recreation yard." Ex. H at 1. Defendant Roach also stated that he was shown a photograph of Plaintiff, but he did "not recall or recognize" him. Id.

Regarding Plaintiff's alleged injuries, Defendants submitted the declaration of Albert Carl Maier, M.D., Senior Physician for the Florida Department of Corrections. Ex. K. Dr. Maier reviewed Plaintiff's medical and mental health records from February 2013 to February 2016 and included copies of the records as attachments to his declaration. He indicates that Plaintiff was given a preconfinement evaluation on February 6 and 28, 2014, and "[n]othing was noted." Id. at 2 (citation omitted). On February 21, 2014, Plaintiff "was assessed in the Emergency Room . . . for allegations of staff abuse on February 6, 2014," and "[n]othing was observed." Id. (citation omitted). Plaintiff "complained about blurred vision," but "the medical provider did not observe any edema, swelling, bleeding, or visible injuries." Id. (citation omitted). "It was also noted that Johnson had 20/20 visual acuity." Id. (citation omitted). As to Plaintiff's alleged injuries, Dr. Maier opined:

> I note that the cut and fractured nose would not heal on their own without treatment. [Plaintiff] is a black male, over the age of thirty-five. A laceration of the claimed size would not spontaneously heal without significant scar formation on a patient of his age and ethnicity. A nose that is out of alignment due to fracture would not re-align on its own. The evaluation on February 21st, which was 15 days after the alleged incident would have shown at least one of the claimed injuries. A cut at this time on his forehead would have been obvious. Bruising would have still been present around his nose area due to a crooked nose. Yet nothing was seen.

Id.

Dr. Maier also discussed Plaintiff's documented history of making complaints about abuse from inmates and officers:

> [Plaintiff's] medical and mental health records do show, however, repeated, unsubstantiated claims made by [Plaintiff] of attacks from inmates and officers. He was repeatedly provided comprehensive medical evaluations, but no injuries were found. His mental health records show that he has been repeatedly determined to be delusional with paranoid ideation, which expresses itself in various claims of imagined injury at the hands [of] other persons. He has a long history of mental illness commencing with his teenage us[e] of alcohol, cocaine, and crack cocaine and evolving into a paranoid delusional state that may herald pre-schizophrenia.

Id. (citations omitted). Dr. Maier concluded that "there is no medical evidence that either supports or corroborates any of the physical injuries alleged by [Plaintiff] to have occurred in February 2014." Id.

Consistent with Dr. Maier's declaration, the medical records reflect that on February 6, 2014, at 10:30 a.m., Nurse Norris evaluated Plaintiff and completed a pre-special housing health evaluation form. Ex. K at 62. Nurse Norris recorded Plaintiff's vital signs and current medications. Id. She also indicated that Plaintiff did not have any apparent acute medical or mental health reasons that would preclude his placement in special housing and that he had no current medical complaints. Id. On February 21, 2014,[6] Plaintiff was seen in the Emergency Room because he reported the alleged staff abuse that is the subject of this case. Id. at 88-89. The examiner reported that Plaintiff had no visible injuries. Id. Plaintiff had

---

[6] One of the signature dates is February 20, 2014, but the documents show an examination date of February 21, 2014. Ex. K at 88-89. The Court assumes the February 20, 2014 date was an error.

9

another pre-special housing health evaluation on February 28, 2014, by Nurse Walters at the Reception and Medical Center (a different institution than where the alleged assault occurred).[7] Id. at 61. Nurse Walters indicated that Plaintiff did not have any current medical complaints nor did he have any infirmities or impairments. Id.

Additionally, Plaintiff's cellmate (Willie Steverson) submitted a declaration stating that he was assigned to the same cell as Plaintiff "[f]or most of the time from the middle of, to the end of, February 2014," during which time he "did not observe anything wrong with [Plaintiff] medically, and did not observe any injuries." Ex. M.[8]

### III. Standard of Review

"'Summary judgment is appropriate where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.'" Hinkle v. Midland Credit Mgmt., Inc., 827 F.3d 1295, 1300 (11th Cir. 2016) (quoting Jurich v. Compass Marine, Inc., 764 F.3d 1302, 1304 (11th Cir. 2014)); see Fed. R. Civ. P. 56(a). "[T]he dispute about a material fact is genuine . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Hinkle, 827 F.3d at 1300 (internal quotations and citation omitted).

> If the movant satisfies the burden of production showing that there is no genuine issue of fact, "the nonmoving party must present evidence beyond the pleadings showing that a

---

[7] Plaintiff was transferred to a different institution on about February 28, 2014, based on the recommendation of the ICT. Ex. G at 2; see Ex. F at 2. "The ICT recommended that Johnson be transferred due to a separate incident where he threatened Senior Classification Officer R. McDonald." Ex. G at 2.

[8] Defendants submitted the internal movements of Plaintiff and inmate Steverson. It appears they were housed in the same cell from February 13, 2014 to February 20, 2014, and then again from February 24, 2014 to February 28, 2014. See Exs. F, L.

10

> reasonable jury could find in its favor." Shiver v. Chertoff, 549 F.3d 1342, 1343 (11th Cir. 2008) (quotation omitted). [The Court] draw[s] "all factual inferences in a light most favorable to the non-moving party." Id.

Winborn v. Supreme Beverage Co. Inc., 572 F. App'x 672, 674 (11th Cir. 2014) (per curiam).

"[W]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986) (footnote omitted). "Although the existence of a genuine issue of material fact precludes judgment as a matter of law, a jury question does not exist because of the presence of a mere scintilla of evidence." Gold v. City of Miami, 151 F.3d 1346, 1350 (11th Cir. 1998) (quotations and citation omitted).

## **IV. Analysis**

A. Official Capacity Claims

Plaintiff states in his Responses that he desires to sue Defendants as a "whole entity (D.O.C.) not individual capacity."[9] Docs. 32, 35. Absent a waiver or action by Congress, the Eleventh Amendment bars a damages suit against a state or a state official in his or her official capacity. Kentucky v. Graham, 473 U.S. 159, 169 (1985); see Zatler v. Wainwright, 802 F.2d 397, 399-400 (11th Cir. 1986). "Congress has not abrogated the states' sovereign immunity for purposes of section 1983 suits for damages, and Florida has not waived its

---

[9] To the extent Plaintiff is now attempting to add the Florida Department of Corrections as a defendant, he cannot do so. See Dukes v. Deaton, 852 F.3d 1035, 1046 (11th Cir. 2017), petition for cert. filed (U.S. Apr. 26, 2017) (No. 16-1299), ("A plaintiff may not amend h[is] complaint through argument in a brief opposing summary judgment." (quotations and citation omitted)).

immunity with regard to such suits." Wusiya v. City of Miami Beach, 614 F. App'x 389, 393 (11th Cir. 2015) (citing Gamble v. Fla. Dep't of Health & Rehab. Servs., 779 F.2d 1509, 1512, 1520 (11th Cir. 1986)). Therefore, to the extent Plaintiff is suing Defendants in their official capacities for monetary damages, his claims are barred.

### B. Use of Excessive Force

The Eighth Amendment prohibits the infliction of cruel and unusual punishment. U.S. Const. amend. VIII. "[T]he core judicial inquiry is . . . whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." Hudson v. McMillian, 503 U.S. 1, 7 (1992). "If force is used 'maliciously and sadistically for the very purpose of causing harm,' then it necessarily shocks the conscience." Cockrell v. Sparks, 510 F.3d 1307, 1311 (11th Cir. 2007) (per curiam) (quoting Brown v. Smith, 813 F.2d 1187, 1188 (11th Cir. 1987)). Courts consider the following factors when analyzing whether force was used maliciously and sadistically:

> (1) "the extent of injury"; (2) "the need for application of force"; (3) "the relationship between that need and the amount of force used"; (4) "any efforts made to temper the severity of a forceful response"; and (5) "the extent of the threat to the safety of staff and inmates, as reasonably perceived by the responsible officials on the basis of facts known to them."

Campbell v. Sikes, 169 F.3d 1353, 1375 (11th Cir. 1999) (quoting Whitley v. Albers, 475 U.S. 312, 321 (1986)). "When considering these factors, [courts] 'give a wide range of deference to prison officials acting to preserve discipline and security, including when considering decisions made at the scene of a disturbance.'" Fennell v. Gilstrap, 559 F.3d 1212, 1217 (11th Cir. 2009) (per curiam) (quoting Cockrell, 510 F.3d at 1311).

"The Eighth Amendment's prohibition of cruel and unusual punishments necessarily excludes from constitutional recognition de minimis uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind." Hudson, 503 U.S. at 9-10 (internal quotations and citations omitted). Indeed, not "every malevolent touch by a prison guard gives rise to a federal cause of action." Id. at 9 (citation omitted). "While a lack of serious injury is relevant to the inquiry, '[i]njury and force . . . are only imperfectly correlated and it is the latter that ultimately counts.'" Smith v. Sec'y, Dep't of Corr., 524 F. App'x 511, 513 (11th Cir. 2013) (per curiam) (quoting Wilkins v. Gaddy, 559 U.S. 34, 38 (2010)). "A prisoner may avoid summary judgment, 'only if the evidence viewed in the light most favorable to him goes beyond a mere dispute over the reasonableness of the force used and will support a reliable inference of wantonness in the infliction of pain.'" Stallworth v. Tyson, 578 F. App'x 948, 953 (11th Cir. 2014) (quoting Brown, 813 F.2d at 1188).

This case presents a common example of a prisoner contending that he was beaten by correctional officers and the correctional officers denying any such incident occurred. Based on the evidence submitted by Defendants, see supra pp. 2-10, the Court finds they have met their initial burden of showing, by reference to declarations, medical records, and deposition testimony, that no force was used against him, much less excessive force. Thus, Plaintiff is required to present evidence to show that there is a genuine issue for trial; he has not done so. If this case were to proceed to trial, Plaintiff would have only his testimony to support his claims. Plaintiff has not provided affidavits from any other inmates who allegedly witnessed Defendants carrying Plaintiff after the alleged attack or anyone who may have

13

seen his injuries after the fact.[10] Nor has he presented any refutation of the contemporaneous medical records which show no injury or even complaint of injury or the subsequent medical records showing no signs of prior injury consistent with Plaintiff's allegations. Nor has Plaintiff explained the videotaped evidence from his deposition showing none of the injuries he alleges. All the exhibits submitted by Defendants support their position.

Notwithstanding the ease with which a prisoner can make an excessive force claim, in many excessive force cases the competing testimony of the prisoner and the correctional officers can be enough to defeat summary judgment. However, both the Supreme Court and the Eleventh Circuit have recognized that summary judgment is appropriate in certain scenarios even if there are conflicting versions of events.

> [W]hen "opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it," a court should not adopt the contradicted version for purposes of ruling on a motion for summary judgment. Scott, 550 U.S. at 380[11] . . . . This is so because when the non-movant's assertion is "so utterly discredited" by the record, no "genuine" dispute of material fact exists sufficient to prompt an inference on behalf of the non-movant. Id.

Singletary v. Vargas, 804 F.3d 1174, 1183 (11th Cir. 2015); see Perez v. Suszczynski, 809 F.3d 1213, 1221 (11th Cir. 2016) ("[W]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a

---

[10] At deposition, Plaintiff testified that there were four or five inmates in the lobby of the classification unit who saw Defendants carrying Plaintiff after the alleged attack. Ex. A at 18. Plaintiff described the inmates, but could only provide one of their nicknames: "Willie B." Id. at 18-19.

[11] Scott v. Harris, 550 U.S. 372 (2007).

court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." (quotations and citation omitted)).

Here, given the strong and consistent testimony of the correctional officers, the supporting testimony of Dr. Maier and Plaintiff's cellmate, the contemporaneous and subsequent medical records, the videotaped deposition showing no evidence of injury, and the lack of any corroborating evidence to support Plaintiff's claim, this is the type of case envisioned by the Supreme Court in Scott, 550 U.S. 372, as to which summary judgment is appropriate.[12] In light of the evidence presented by Defendants and Plaintiff's failure to provide any evidence other than his own uncorroborated and internally inconsistent testimony, no reasonable jury could find for Plaintiff in this case. See generally Goodman v. Kimbrough, 718 F.3d 1325, 1332 (11th Cir. 2013) (recognizing that "to defeat a motion for summary judgment, [the plaintiff] must adduce specific evidence from which a jury could reasonably find in his favor; [t]he mere existence of a scintilla of evidence in support of [his] position will be insufficient" (quotations and citation omitted)); Kesinger v. Herrington, 381 F.3d 1243, 1249-50 (11th Cir. 2004) (stating that "[a] mere scintilla of evidence in support of the non-movant is insufficient to defeat a motion for summary judgment" (citation omitted)); see also Bryant v. Rich, 530 F.3d 1368, 1382 (11th Cir. 2008) (Wilson, J., concurring in part, dissenting in part) ("A prisoner cannot defeat summary judgment by relying on sham affidavits, bare and self-serving allegations, or other evidence that is

---

[12] The Court understands that in Scott there was a videotape documenting the event in question, whereas there is no videotape evidence of the alleged event here. However, the undersigned does not view the reasoning of the Supreme Court in Scott to be limited to cases in which there is videotape evidence of the event itself.

incredible as a matter of law. He must raise more than a mere scintilla of evidence in support of his position: in order to defeat summary judgment, there must be evidence on which the jury could reasonably find for the prisoner." (citations omitted)); Bennett v. Parker, 898 F.2d 1530, 1534 (11th Cir. 1990) (Prisoner's "claim of serious injury is only a conclusory allegation, unsupported by any physical evidence, medical records, or the corroborating testimony of witnesses, and we therefore discount it.").[13] Accordingly, it is

**ORDERED:**

1. Defendants' Motion for Summary Judgment (Doc. 25) is **GRANTED**.[14]

---

[13] There are a number of unpublished Eleventh Circuit decisions that deal with similar situations on summary judgment. Depending on the unique facts of each case, in some the Eleventh Circuit has upheld summary judgment, in others it has reversed. Affirmed: see, e.g., Smith v. Sec'y, Dep't of Corr., 524 F. App'x 511, 513-14 (11th Cir. 2013) (finding that even "[t]aking [the plaintiff's] account as true, the attack was no more than a de minimis use of force," and the medical records did not support the plaintiff's allegations); Whitehead v. Burnside, 403 F. App'x 401, 403 (11th Cir. 2010) (stating that "[s]elf-serving statements by a plaintiff do not create a question of fact in the face of contradictory, contemporaneously created medical records"); Vicks v. Knight, 380 F. App'x 847, 852 (11th Cir. 2010) (recognizing that the plaintiff's "version of events . . . was contradicted by all of the relevant evidence, with the exception of his own affidavit," and finding that based on the evidence presented including medical records showing no injury, "a reasonable factfinder could not believe that [the plaintiff] suffered any injury, and thus could not reasonably infer that [the correctional officer] used anything more than a de minimis amount of force"). Reversed: see, e.g., Joassin v. Murphy, 661 F. App'x 558, 560 (11th Cir. 2016) (recognizing that the evidence presented "no more than a swearing contest between interested witnesses"); Reid v. Sec'y, FL Dep't of Corr., 486 F. App'x 848, 852 (11th Cir. 2012) (acknowledging that the medical records did not support the plaintiff's version of the facts in his affidavit, but finding that "for purposes of summary judgment, there is nothing inherently wrong with 'self-serving testimony,' and it may not be disregarded by the district court in determining whether there is a genuine dispute of fact on a material issue in the case"); Logan v. Smith, 439 F. App'x 798, 801-02 (11th Cir. 2011) (concluding that "the videos are insufficient to eliminate the possibility that the defendants applied sufficient force to violate the Eighth Amendment" and discussing other evidence that "suggest[ed] some injuries might have been present").

[14] Because the Court grants the Motion on the substance of the Eighth Amendment claim, the Court need not address Defendants' remaining arguments.

2. The Clerk shall enter judgment in favor of Defendants and against Plaintiff and thereafter close the file.

**DONE AND ORDERED** at Jacksonville, Florida, this 29th day of August, 2017.

TIMOTHY J. CORRIGAN
United States District Judge

JAX-3 8/28
c:
Andrae J. Johnson, #T06510
Counsel of Record